```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
                                                            :
UNITED STATES OF AMERICA,                                   :
                                                            :     MEMORANDUM
                     -against-                              :     DECISION AND ORDER
                                                            :
MICHAEL BOLINO,                                             :     06-cr-806 (BMC)
                                                            :
                                        Defendant.          :
----------------------------------------------------------- X
```

**COGAN,** District Judge.

Before me is defendant's motion to reduce his sentence to time served or in the alternative, for release to home confinement, pursuant to the compassionate release statute, 18 U.S.C. § 3582(c)(1)(A)(i). Defendant argues that his various medical conditions and age, coupled with the current COVID-19 pandemic, constitute "extraordinary and compelling reasons" warranting his release from prison before the termination of his sentence.

The motion is denied. I do not agree that the mere potential of exposure to COVID-19, even with defendant's pre-existing medical conditions, constitutes "extraordinary and compelling reasons" for his release. Finally, even if I were to overlook this failing, consideration of the factors under 18 U.S.C. § 3553(a) weigh in favor of continued custody.

## BACKGROUND

### I. The Guilty Plea and Sentence

On March 11, 2010, defendant was sentenced after pleading guilty to conspiracy to collect an extension of credit by extortionate means, in violation of 18 U.S.C. § 894(a)(1), one of the six counts with which he had been charged. The other five counts, all dismissed at sentencing, were: (1) conspiracy to assault in aid of racketeering, 18 U.S.C. § 1959(a)(6); (2) conspiracy to make extortionate extensions of credit, 18 U.S.C. § 1959(a)(6); (3) conducting an

illegal gambling business, 18 U.S.C. § 1955(a); (4) conspiracy to commit bank robbery, 18 U.S.C. § 371; (5) and using extortion to collect credit, 18 U.S.C. § 894(a)(1).

At the time of his sentencing, defendant had the following prior convictions: a 1980 conviction for federal bank robbery for which he was sentenced to 10 years' imprisonment; and 1996 convictions for Hobbs Act robbery, 18 U.S.C. § 1951(a), and for using or carrying a firearm during and in relation to that robbery, 18 U.S.C. § 924(c), for which he was sentenced to a total of 97 months' imprisonment.

Based on these prior convictions, the Government filed a prior felony information notice (the "Notice"), triggering the application of the "three-strikes" statute, 18 U.S.C. § 3559(c). The statute provides that a defendant convicted of three "serious violent felonies" faces a mandatory sentence of life imprisonment. Because of defendant's 1980 and 1996 convictions, the parties believed that if he was convicted of any of the six counts in this case that were "serious violent felonies," he would receive the mandatory life sentence.

To avoid that risk, defendant entered into a plea agreement and pleaded guilty to the single count of conspiracy to use extortion to collect a debt. If that count constituted a "serious violent felony" under § 3559(c), defendant would have qualified as a three-strike offender and received a mandatory life sentence. However, in exchange for defendant stipulating to an above-Guidelines sentence of 240 months' custody, the Government agreed to seek dismissal of the Notice. That it did, and the late Judge Sandra Townes granted the Government's motion to dismiss the Notice, as well as the open counts, when she sentenced defendant to 240 months' imprisonment.

The Second Circuit substantially affirmed defendant's sentence. See United States v. Bolino, 450 F. App'x 47 (2d Cir. 2011). With credit for good time, which he has so far received, defendant has a projected release date of February 5, 2024.

## II.     The Instant Motion

Defendant seeks compassionate release under 18 U.S.C. § 3582(c) because he is 59 years old and has Parkinson's Disease, bipolar disease, heart disease, atherosclerosis, chronic chest pain, and a litany of other medical issues.[1] This is his second time seeking compassionate release. Earlier this year, I denied his prior motion without prejudice for failure to exhaust his administrative remedies.[2]

The Government opposes defendant's motion on three grounds: (1) defendant has failed to exhaust his administrative remedies by failing to appeal the warden's timely denial; (2) defendant has not met his burden of showing extraordinary and compelling reasons warranting release; and (3) even assuming that he did, the factors set forth in 18 U.S.C. § 3553(a) militate towards continued confinement.

## DISCUSSION

## I.     Exhaustion

In general, a "court may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). However, a defendant may bring a motion to reduce the term of his imprisonment under the compassionate release statute, 18 U.S.C. § 3582(c)(1)(A)(i). A defendant may only apply to the court for release under this provision once he has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion

---

[1] Defendant also claims that hand tremors cause him extreme difficulty when putting on his clothes and states his chronic knee issues make it difficult for him to walk.

[2] See United States v. Bolino, 06-cr-806, 2020 WL 32461 (E.D.N.Y. Jan. 2, 2020).

on [his] behalf or the lapse of 30 days from the receipt of such a request by the warden[.]" Id. § 3582(c)(1)(A).

District courts in this Circuit have split on how to interpret this language, and the Court of Appeals has not yet resolved the split.[3] Some courts have held that delivery of the request for compassionate release to the warden and the expiration of 30 days thereafter – whether or not the warden acts on the request – is sufficient to fully exhaust. See, e.g., United States v. Haney, No. 19-cr-541, 2020 WL 1821988, at *3 (S.D.N.Y. April 13, 2020). Other district courts have held that if the warden denies the request within 30 days, a defendant must complete each of the two levels of appeal that follow the warden's denial. See, e.g., United States v. Ng Lap Seng, No. 15-cr-706, 2020 WL 2301202, at *6 (S.D.N.Y. May 8, 2020) (interpreting the word "lapse" as "requiring the BOP's failure to respond to a prisoner's request for compassionate release motion within thirty days"); United States v. Davis, No. 96-cr-912, 2020 WL 2522079, at *2 (E.D.N.Y. May 18, 2020) (stating "[i]t seems odd that Congress would allow a defendant to short-circuit the [BOP's] administrative procedures simply by waiting 30 days after filing his request, despite the warden timely acting on that request") (citation omitted).

Here, an issues arises because defendant sent two separate requests seeking compassionate release to the warden within the span of six days: (1) his attorney mailed a letter to the warden on February 13, 2020; and (2) defendant submitted an internal "Inmate Request to Staff" form on February 18, 2020.

It is undisputed that the warden denied the second request only a few days after it was filed. Attached to the Government's opposition is a letter dated February 20, 2020, in which the warden acknowledged receipt of defendant's February 18th form seeking compassionate release

---

[3] The Third Circuit has held that full exhaustion is not required if the warden denies a defendant's request within 30 days. See United States v. Harris, 812 F. App'x 106, 107 (3d Cir. 2020).

4

and denied the request because, after reviewing defendant's medical records, the warden concluded defendant's circumstances did "not meet the requirements for debilitated medications conditions." In the denial, the warden made no reference to counsel's earlier February 13th correspondence. In fact, according to the Government, the BOP denies ever receiving counsel's letter filed on defendant's behalf. However, in his reply, defendant attached a denial letter from the BOP dated July 27, 2020 acknowledging receipt of counsel's correspondence and denying the request. The letter provides no explanation why it took the warden over five months to respond to defendant's first request or that the warden had intended his February 20th denial to serve as his formal response to both requests.

It is not apparent why defendant sent two requests seeking compassionate release within the span of six days, even though there was no material change of circumstance and both requests sought the same relief on the same grounds. Defendant offers no explanation for it. The two proximate requests could only cause confusion and increase the chances of an administrative error. Indeed, one could reasonably conclude that it was a tactic to increase the likelihood of a non-response to at least one of the letters, thereby permitting defendant to avoid exhausting his administrative remedies.

Defendant's contention that his first request, although preceding his second by only a few days, remained "pending" despite the warden's denial of the second, is somewhat disingenuous. The second request authorized the warden to review defendant's entire medical records, so it was actually a more robust application than the first request, which did not contain any of defendant's medical records. The first request was also a two-page letter simply listing defendant's various medical issues. In other words, the warden had more accurate and complete information as to defendant's latest medical issues when reviewing defendant's second request.

5

Nevertheless, I cannot overlook the warden's failure to either reference or timely respond to defendant's first letter for over five months. The compassionate release statute permits a defendant to seek judicial relief upon fully exhausting all administrative rights or a "lapse of 30 days from the receipt of such a request by the warden[.]" Because more than 30 days had passed between defendant's first request and the warden's denial on that particular request, defendant will be deemed to have exhausted his administrative remedies.[4]

## II.    "Extraordinary and Compelling Reasons"

Despite exhaustion, I am denying the motion because defendant has failed to show extraordinary and compelling reasons for a sentence reduction. The defendant bears the burden of showing that these factors compel his release. See United States v. Ebbers, 432 F. Supp. 3d 421, 426 (S.D.N.Y. 2020) (citing United States v. Butler, 970 F.2d 1017, 1026 (2d Cir. 1992)).

Absent a terminal illness, the Sentencing Commission would permit compassionate release because of a defendant's medical condition if he is "suffering from a serious physical or medical condition . . . that substantially diminishes [his] ability . . . to provide self-care within the environment of a correctional facility and from which he . . . is not expected to recover." U.S.S.G. § 1B1.13 Application Note 1(A).

On his motion, defendant relies on two arguments. First, he contends that FCC Butner has been ravaged by the pandemic, pointing out that there have been over 947 confirmed cases of COVID-19 and 18 pandemic-related deaths. Second, he states that he suffers from serious medical issues warranting compassionate release. Both of these contentions are belied by

---

[4] My determination of this issue might have been different in a case where a defendant, upon receiving the warden's timely denial of his request, decides to simply overwhelm the warden with duplicative requests seeking compassionate release in hopes of a non-response, rather than exhausting his administrative remedies.

evidence in the record, and therefore defendant has not carried his heavy burden demonstrating that relief is warranted.

As the Government points out, defendant greatly exaggerates the number of confirmed active cases of COVID-19 at FCC Butner Medium II by conflating the four separate facilities that comprise FCC Butner: (1) FCI Butner Low; (2) FCI Butner Medium I; (3) FCI Butner Medium II; and (4) Federal Medical Center Butner. If we look specifically at FCI Butner Medium II, the facility in which defendant is confined, it is clear that the BOP's various policies have decreased the risk faced by both inmates and staff members. Specifically, defendant attempts to portray the facility as a petri dish for the virus and argues that it is only a matter of time before he succumbs to the virus. But as of August 16, 2020, there is only one confirmed active case of COVID-19 at Butner II (0 inmates and 1 staff).[5] Since the beginning of the pandemic, no inmate or staff member has died due to the virus and three inmates and one staff member at Butner II have recovered from COVID-19. See United States v. Arland, No. 5:11-cr-73, 2020 WL 4597311, at *2 (W.D.N.C. Aug. 11, 2020); United States v. Holder, No. 1:18-cr-609, 2020 WL 4570524, at *1 n.2 (N.D. Ohio Aug. 7, 2020).

Butner II has also implemented the following measures to combat the spread of the virus: (1) social visits and legal visits have been suspended, with case-by-case accommodations for attorney visits and legal calls; (2) all inmate facility transfers have been suspended with limited exceptions for forensic studies, Interstate Agreements on Detainers, and medical or mental health treatment; (3) new inmates are screened for COVID-19 exposure risk factors and symptoms and inmates exhibiting either one are quarantined; and (4) the BOP has implemented modified operations nationally to maximize social distancing and limit group gatherings in BOP facilities,

---

[5] See https://www.bop.gov/coronavirus/ (last visited Aug. 16, 2020).

7

among other modifications specific to each facility.  I also must recognize that the BOP has, thus far, been successful in preventing defendant from becoming exposed to the virus – despite defendant's contention that the virus is pervasive and ravaging the facility.

Based on the BOP's handling of the pandemic, so far as it relates to conditions at Butner II, I therefore cannot find that the generalized danger defendant faces from the mere threat of exposure to COVID-19 constitutes an extraordinary and compelling reason for granting compassionate release.  See United States v. Korn, No. 11-cr-384S, 2020 WL 1808213, at *7 (W.D.N.Y. Apr. 9, 2020) (finding that the "mere possibility of contracting a communicable disease, in the absence of any [BOP] failures," is insufficient).

Moving now to defendant's medical issues, his pre-existing medical conditions are simply not the kind of life-threatening impairments that militate towards release.  Nor does defendant advance any real argument how his medical condition "substantially diminishes" his ability "to provide self-care within the environment of a correctional facility and from which [he] is not expected to recover."  U.S.S.G. § 1B1.13, Application Note 1.  The objective evidence does not support defendant's contention that he is on brink of death.  Many of his representations about his "unique" circumstances are undermined by his own medical records.

Defendant's primary contention – that he was told by a cardiologist and another physician at FMC Butner around January 20, 2020 that he "has significant heart blockage, greater than ever before" and thus requires immediate heart bypass surgery – is unsupported by the record.  Not only did defendant fail to provide any documentation to corroborate this purported conversation with his cardiologist or an affidavit from a medical provider, but records provided by the Government show that defendant's concerns are baseless.  According to medical records from February 14, 2020, after defendant underwent a heart catheterization at Duke

8

University Medical Center, he was seen by a registered nurse from the BOP and told the nurse, "they didn't find any blockage, everything was clean." Nor is there any evidence from any provider showing significant heart blockage or the need for an immediate coronary bypass surgery in the 237 pages of medical records provided by the Government. In his reply, defendant did not clarify or explain the discrepancy between his representation to the Court and the medical records provided by the Government.

It is true that defendant suffers from Parkinson's and bipolar disease. But both medical conditions are stable because defendant is on medication, and there is no indication that this materially impacts his ability to self-care. The medical records indicate that he "communicates well [without] difficulties" and that defendant is regularly seen by medical providers whenever any issues arise. Defendant does not allege that he is receiving inadequate care from the BOP.

Defendant also contends that he has chronic knees issues, difficulty walking, and experiences tremors in his right hand, thereby impacting his ability to self-care. However, recent medical records from April 6, 2020 note that defendant "ambulates [without] difficulties using a walker" and "ambulates to [the provider's] office [without a] walker with no difficulties or distress." Serious tremors in his right hand are corroborated by his medical records, but according to a clinical assessment from January 27, 2020, this neurological issue is limited to one hand. Even defendant concedes he maintains full use of his left hand, which he uses to eat, shave, and brush his teeth.

Defendant is 59 years old, but he has not yet, and may not ever, become seriously ill due to COVID-19. Most people who contract the disease do not. See United States v. Santiago, No. 92-cr-563, 2020 WL 2475068, at *3 (E.D.N.Y. May 13, 2020). If he does become exposed to the virus, his facility seems well equipped to deal with it. If an inmate displays symptoms of the

virus, the facility takes immediate precautionary steps to remove the inmate from the general population and move him into an isolated unit.

### III. Section 3553(a) Factors

Nor could defendant's motion survive the application of the relevant sentencing factors. Defendant has a long history with the Colombo organized crime family and his extensive, violent criminal history proves that prison has not deterred his unlawful predilections. Despite receiving a substantial sentence for armed robbery in 1980, defendant again committed two armed robberies upon his release, for which he again spent time in prison. Upon his release from prison a second time, defendant again reoffended and continued to pledge loyalty to the Columbo crime family. Although defendant contends that he is now a changed man, I cannot overlook defendant's pattern of reoffending, despite significant incarceration. He has not shown why this time is any different than his prior instances of incarceration.

To reduce defendant's sentence would be diminishing his transgressions and undermining the goals of Judge Townes's original sentence, among them, the need to dispense adequate punishment for defendant's multiple acts throughout his criminal career and to deter others from emulating his behavior.[6]

---

[6] In a supplemental reply, for the first time, defendant raised the argument that United States v. Davis, 139 S. Ct. 2319 (2019), would have resulted in a maximum sentence of 15 years at his original sentencing and thus attempts to bolster his argument seeking compassionate release. Arguments raised for the first time in a reply memorandum are waived and need not be considered. See, e.g., Connecticut Bar Ass'n v. United States, 620 F.3d 81, 91 n.13 (2d Cir. 2010). In any event, the statute under which defendant was convicted, 18 U.S.C § 894, permits a maximum prison sentence of 20 years. See United States v. Bolino, 450 F. App'x at 49.

## CONCLUSION

Defendant's motion to reduce his sentence [529] is denied.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
       August 17, 2020