FILED
CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ OCT 15 2020 ★
BROOKLYN OFFICE

IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF NEW YORK

Michael Bolino                                Case: 06-Cr-806-BMC
Petitioner

vs

United States of America

---

MOTION FOR RECONSIDERATION PURSUANT TO FRCP 60(b)
AND NEW PRECEDENT CASE OF US V ZULLO 19-3218-CR
AND REQUEST FOR APPOINTMENT OF NEW COUNSEL

---

Comes now the petitioner, Mr. Michael Bolino, hereby pro se, humbly before the Court to move the Court to Reconsider the Compassionate Release Reduction in Sentence or to Order the petitioner to be Release to Home Confinement at the below address:
Mr. John Whittaker (Nephew)
419 Hubert Road
Jeffersonville, NY 12748
Cell Ph. 845-807-9267
Home 845-434-0187



According to FRCP 60(b), the Motion to Void Judgment and Reconsider must be filed within 1 yr of the ruling. In this case, the Court of Appeals just ruled on the Zullo case on Sept. 25, 2020 and this Court just denied the petitioner less than 2 months, thus deeming the 60(b) Motion as timely filed

The Zullo case has shown that the District erred in its original usage of 1b1.13 because it was only to be applied "when and if" the the BOP filed the motion on a defendants behalf not if the defendant

1

files. In this case, the Court repeatedly asserted and relied on 1b1.13 thru-out the denial motion (Doc 542) and now in light of the new 2nd Circuit precdent case of Zullo, the Judgment is Void and must be Vacated and the Reconsideration based upon the previous filing as well as the subsequent changes.

Since the petitioner was denied, the BOP has had 7 confirmed cases among inmates and staff here at FCI Butner II. (See BOP/coranvirus.com). Also, since the courts ruling, there have been new rulings that showed that the BOP is not prepared under any condition to account for the cornavirus impact. In fact, on Oct. 1 2020, the New National Commission on Covid 19 and Criminal Justice released its 1st report since it was established in late July that had the following immediate recommendations:

1. Preserve public health in addition to public safety
2. Get the facts and rely on a strong data and science
3. Be [proactive], going above and beyond normal measures to protect [all] those connected to the "criminal justice" system
4. Improve equity and increase inclusion in decision making, being mindful of the racial and other disparities that plague both the health & justice systems
5. Stop exponetial growth. According to the Board's Report, expononial growth means that one person infects many
6. [Reduce Density]- given the risks associated with the criminal justice contact during the pandemic..the leaders should reduce

2

density wherever possible. Such measures may include limiting custodial arrest, reducing admissions to & [increasing releases from jails and prisons]

Here, when the court reviews the denial order, it will see that at the time it made its ruling the FCI Butner II was only reflecting 1 case at this facility, but now as of Aug/Sept it now 7 or more. In fact, the government in the 4th circuit in US v Riley, Dist of South Carolina (Sept 2020) just laid out a 10 page argument in which it focused on the BOP procedures and preventive measures taken since Jan 2020 but concluded that even with all these measures they were still unable to prevent the infection of Covid 19 from entering and killing inmates and staff alike. Then the government finished the argument by stating that..it is only about to get worst. When the government takes this sobering position and even acknowledges this, it means we are in trouble.

Another concern of the Court was the impact of Covid on people like Mr. Bolino who have parkinson disease and blood clots . Since the original filing and denial the CDC and others have perform studies and found that the covid 19 triggers a bradykinin storm in the body, which produces a chemical that regulates blood pressure in "extreme excess" throwing the respiratory, gastrointenstinal and neurological pathways off balance. (See Livescience, the new coranavirus can infect brain cells (Sept 13, 2020).

3

The report futher found that the covid 19 can lead to blood clots, leaky capillaries and inflamed blood vessels, which is why patients may experience heart damage or strokes. (See Business Insider, (Sept 13, 2020)

Another report found that people like Mr. Bolino who have parkinsons get severely worst..in fact..the words used in this report was that ..Everything Worsened" said Dr. Carlie Tanner, a professor of neuroloy at the University of California, San Francisco. (See USA Today from July 15, 2020 by Karen Weintraub.)

A rule 60(b) is the appropriate vehicle to be used to re-open the case, and for the Court to Vacate the judgment because it is not raising new claims, but instead is showing that the Court erred when it relied on the 1b1.13 for any reason when it made its decision to deny the petitioner. Therefore the petitioner moves the Court to Vacate and Void the Judgment and to Grant the reduction in the Sentence (RIS, Compassionate Release) or to Order the petitioner to be transferred to Home Confinement pursuant to the Cares Act.

Another thing the Court may not be aware of , is that the BOP just started there "visits back on Oct. 3, 2020" and therefore,the only measures taken ..[is]..to scan for a fever. But everyone is aware that "by the time" the fever has shown, the person has already had the virus for 7-14 days and infected all those it came in contact with. Here, [we] all use the same air ventalations and if one person gets, its destined to spread. The CDC & IG have both

4

stated that the BOP is not to use the SHU as means of prevention because it requires a "decompressioned room" which is not here. Therefore, the petitioner prays that the Court Grant the petition and Orders the petitioner to be Immediate Released [or]... to Home Confinement or Grants the Compassionate Release. In the alternative, that the Court Appoints Counsel to assist with this filing and to resolve the most appropriate remedy. Home confinement is not a reduction of the sentende, it is only a difference in where it is being served at the time.  this case, if the court is most concerned about cutting the sentence as the compassionate release allows, then the best remedy is to Order the Home confinement.

Therefore, in light of Zullo and the subsequent developments the petitioner moves the Court to Vacate and Void the Judgement and Grant either the RIS or Home Confinement. In alternative, to Grant Counsel for futher arguments.

Respectfully submitted on this __6__ day of Oct., 2020

S/ *Michael Bolino*
Mr. Michael Bolino
Fed # 13012-053
FCI Butner II
PO Box 1500
Bütner, NC 27509

5

CERTIFICATE SERVICE   28 USC 1746

I, Michael Bolino,, do hereby swear under the penalty of perjury that a copy of the FRCP 60(b) Motion has been sent to the E.D. NY on this 6 day of Oct. 2020.,from FCI Butner II.

S/ *Michael Bolino*
Mr. Michael Bolino

6

USA Today
7/14/20

# Pandemic takes a toll on people with Parkinson's disease

**Karen Weintraub**
USA TODAY

The COVID-19 pandemic has made it harder to live with Parkinson's disease, according to a survey of more than 7,000 people who have the disease or care for someone with it.

This spring, people with Parkinson's had more trouble moving, and more mood swings, anxiety and depression – all typical symptoms of the chronic illness. Most also reported difficulties attending medical appointments, receiving in-home care, getting adequate exercise, obtaining their medications and participating in social activities, according to the survey conducted by the Michael J. Fox Foundation for Parkinson's Research.

"Everything worsened," said Dr. Carlie Tanner, a professor of neurology at the University of California, San Francisco, who helped lead the study.

About 1 million Americans have the progressive disease, which is characterized by tremors, slow movement, stiffness and loss of balance.

The survey included 51 Parkinson's patients who said they caught COVID-19. Just over half of them reported worsening of their symptoms, including tremors, loss of balance, mood issues, digestive problems, pain and fatigue.

Those with both diseases were more likely to be former or current cigarette smokers and to have lung disease, Tanner said.

"There wasn't really a suggestion that people with Parkinson's were more likely to have other bad outcomes," she said.

Not much information exists about the two diseases in combination, although the risk of Parkinson's increases with age, so most people with the condition are also at higher risk for a serious case of COVID-19, she noted.

### "Everything worsened."

**Dr. Carlie Tanner,** a professor of neurology at the University of California, San Francisco, who helped lead the survey of more than 7,000 people

Tanner said she was surprised at the toll that living through pandemic – even without catching COVID-19 – took on people with Parkinson's, "because of social isolation, and a change in access to many services."

People of color and those with low incomes suffered the most disruption of services including medical care, exercise classes and access to food, the survey found.

While acknowledging the difficulties, Tanner said people with Parkinson's should make a particular effort during the pandemic to be in touch with others "in whatever ways are possible" – via phone, internet and socially distant visits – to maintain their social connections.

Respondents completed the survey between April 23 and May 23, although the foundation plans to keep it open indefinitely to continue collecting information from people with the disease.

The survey is part of the Fox Insight online clinical study, a 3-year-old research project that explores the lived experience, genetics and variability of Parkinson's. It includes more than 50,000 volunteers, and de-identified data from the study is made available to qualified researchers.

*Health and patient safety coverage at USA TODAY is made possible in part by a grant from the Masimo Foundation for Ethics, Innovation and Competition in Healthcare. The Masimo Foundation does not provide editorial input.*

Last week, the 7th Circuit reversed in an en banc opinion that rejects the 3rd Circuit decision in US v Hodge. Because the prior sentence had been vacated, the 7th said, it was a "nullity." A vacatur "wipes the slate clean," meaning that at the time First Step passed, Harry was convicted and awaiting sentencing. Congress wrote First Step's changes in 924(c) stacking to "apply to any offense that was committed before the date of enactment of this Act, if a sentence for the offense has not been imposed as of such date of enactment," making no distinction between defendants who had never been sentenced and those whose sentence had been vacated fully and who were awaiting the imposition of a new sentence. "In this way," the Circuit explained, "Congress stanched, to the degree that it could without overturning valid and settled sentences, the mortmain effect of sentencing policies that it considered no longer in the Nation's best interest. It ensured, moreover, all persons awaiting sentencing on the effective date of the Act would be treated equally, a value long cherished in our law."

So Harry's good fortune in getting his sentence overturned under Alleyne, which saved him two years, just saved him an extra 20.

The 7th Circuit last week held that the same rule benefitted Ralph Brittany. Ralph was sentenced for a crack conspiracy in 2013, but later won a 2255 motion on the grounds his lawyer erred in letting the court use the wrong edition of the Guidelines. He was resentenced after First Step passed, but his sentencing court would not let him benefit from the lower drug mandatory minimums passed in Sec 401 of the Act.

The 7th applied the same rule. The 2255 vacated Ralph's sentence, so he was in the same position as a defendant who had never been sentenced. The Circuit remanded the case for a ruling on whether the sentence would have changed if lower mandatory minimums had been considered.

Finally, in the 3rd Circuit, Pete Pascal had filed a Sec 404 motion, the First Step section that made the 2010 Fair Sentencing Act retroactive. The district court decided that Pete was eligible for a reduction, but denied him one because Pete's Guidelines range did not change even if the FSA was applied.

Pete appealed, arguing that a district court had to consider the sentencing factors in 18 USC 3553(a), not just a mechanistic look at the guidelines. Last week, the 3rd Circuit agreed.

While other circuits generally agree that a district court may consider the Sec 3553(a) factors, the 3rd said a judge must do so. "Section 404(b) uses the word "impose" twice, and the first instance clearly refers to the act of imposing the original sentence." The Circuit ruled. "Because Congress used the same word, we can infer that it conceived of the district court's role as being the same when it imposes an initial sentence and when it imposes a sentence under the First Step Act. As the text of § 3553(a) makes clear, district courts look to the factors set forth there whenever they impose a sentence on a defendant."

The 3rd Circuit joins the 4th and 6th Circuits in adopting the rule.

US v Uriarte, 2020 U.S. App. LEXIS 29234 (7th Cir. Sept 15, 2020)
US v Bethany, 2020 U.S. App. LEXIS 29246 (7th Cir. Sept 15, 2020)
US v Easter, 2020 U.S. App. LEXIS 29243 (3d Cir. Sept 15, 2020)
<><>

COVID-19: NEW REASONS TO BE VERY AFRAID

The Bureau of Prisons once again gained nothing last week against COVID-19. The number of inmates sick with the hovered all week between 1,915 and 2,045. But the number of sick staff started climbing again, from 631 a week ago to 642. The number of BOP facilities with the virus climbed as well to 114, 93% of all institutions. Ominously, the number of dead inmates jumped from 125 to 130.

Surprisingly, for the first time since the middle of March, the BOP did not post any numbers at all for Saturday or yesterday. The BOP has COVID-19 tested 37% of the BOP inmate population. The percentage of tests that are positive remains 25%.

One of last week's deaths is especially troubling. On June 1, FCI Butner inmate Ricky Miller tested positive for COVID-19. A month later, he tested negative, and was declared recovered. But two months later, Ricky developed shortness of breath and leg edema, and was hospitalized. The hospital found that he had COVID-19. He died last week..

The timing suggests that Ricky caught COVID twice within a few months. If that is so, then the idea that having the virus once confers immunity against getting it again is cast into doubt. And that could mean that COVID-19 will remain a risk, even for people who have had it.

